IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

TAMMY RIVERO, AND
HOWARD BENNETT

    Individually, and On Behalf of All
    Others Similarly Situated,

    Plaintiffs,

v.

LUNG INSTITUTE, LLC

    Defendant.
_____/

Case Number: 16-CA-7765
Division: F

CLASS REPRESENTATION

## THIRD AMENDED COMPLAINT

Plaintiffs, TAMMY RIVERO and HOWARD BENNETT, individually and on behalf of all others similarly situated (hereinafter "Plaintiffs" and "Putative Class Members"), by and through the undersigned attorneys, bring this action on behalf of herself, himself, and other former and present patients of Defendant LUNG INSTITUTE, LLC ("Lung Institute"), pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and other violations of Florida state law to recover damages, attorney's fees, and costs, and states as follows:

## I.
## PARTIES

1.    At all times pertinent to this action, Plaintiff TAMMY RIVERO, an individual, was and is a resident of Burke County, North Carolina.

2.    At all times pertinent to this action, Plaintiff HOWARD BENNETT, an individual, was and is a resident of 6415 Curtiss Lane, Spring Hill, Hernando County, Florida 34608.

3.    At all times pertinent to this action, Defendant, LUNG INSTITUTE, LLC was and is a company incorporated in the State of Delaware and authorized to conduct business in Florida.

Defendant's principal place of business is in Hillsborough County and is located at 201 E. Kennedy Blvd., Ste. 425, Tampa, Florida 33602.

4. Defendant's registered agent for service of process is James St. Louis III ("Jimmy St. Louis III"), 201 E. Kennedy Blvd., Ste. 425, Tampa, Florida, 33602.

5. At all times relevant to this action Defendant engaged in acts or practices in the conduct of "trade or commerce" as defined in Fla. Stat. § 501.203(8).

## II.
## JURISDICTION & VENUE

6. This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00) excluding interest, attorney's fees and costs.

7. Plaintiff Tammy Rivero is a resident of Burke County, North Carolina.

8. Plaintiff Howard Bennett is a resident of Hernando County, Florida.

9. Defendant's breaches of duty, tortious activity, misleading statements, and deceptive scheme emanated from within Hillsborough County, Florida; thus, this cause of action arises within the jurisdiction of this court and venue is proper.

10. Defendant is operating, present, and/or doing systematic and continuous business within this jurisdiction such that its nerve center is located in Tampa, Florida.

## III.
## GENERAL ALLEGATIONS

11. Defendant is a company that operates medical offices in the State of Florida, as well as throughout the United States.

12. Defendant provides "stem cell" therapy procedures that purport to treat a litany of serious diseases, including chronic obstructive pulmonary disease ("COPD"), Interstitial Lung Disease, Hypersensitivity Pneumonitis, Sarcoidosis, Osteoarthritis, Rheumatoid Arthritis, Lupus, and even Crohn's Disease.

13. Defendant, through its advertising, promotes procedures that promise to "regenerate, repair, or regrow" lung tissue and "heal degenerating organs."

14. Defendant is essentially a marketing company masquerading as a medical "institute." Defendant intentionally circumvents FDA regulation by purporting to inject patients' own "stem cells" back into their bodies. During the course of its operation, Defendant has offered at least three purported "stem cell" treatments to the general public under the representation and auspices that these procedures are effective. Specifically, Defendant has offered "venous" procedures, "bone marrow" procedures, and "adipose" procedures.

    (a) In the "venous" procedure, Defendant takes a blood draw from the patient, runs the blood through a centrifuge, and then reinjects the very same blood into the patients' blood stream. There is no evidence that any stem cells are extracted from the peripheral blood and no evidence that the very same cells extracted from the patient's body have any beneficial effect on any pulmonary disease.

    (b) Similarly, Defendant's "bone marrow" procedure involves the removal of a small amount of the patient's bone marrow fluid, along with the patient's blood, which is then re-injected into the patient's own body. Defendant solely relies on "anecdotal" evidence in support of the efficacy of its procedures. Not a single double blind, placebo-controlled study and not a single piece of medical literature supports the efficacy of any of Defendant's "stem cell" procedures.

    (c) In the "adipose" procedure, adipose tissue, composed predominately of body fat, is removed from the patient. Defendant purported to isolate "stem cells" from the patient's adipose tissue, which is then reintroduced into the patient's body. Defendant no longer administers this procedure and at least one clinic in Florida unrelated to Defendant has been shut down for providing so-called adipose stem cell therapy.

15. From 2013 to the present the Defendant urged prospective patients through their convoluted, deceptive marketing, advertising and targeted sales calls, and through other events hosted throughout the United States, including seminars and webinars, to become patients of the Lung Institute and to pay for and undergo procedures.

16. Defendant employs doctors which are held out as being "medical directors" of various locations; however, they are independent contractors, they are not pulmonologists, they rarely if ever perform the procedures, and are they are paid exorbitant salaries to keep patients from backing out or complaining on the web about the failure of the procedures. They allow their credentials to be used to prop up the legitimacy of this enterprise, and essentially work for the marketing team, which is employed by RMS. They read scripts for marketing videos and contact patients at the behest and direction of "Patient Coordinators" who are bonused and commissioned salespeople.

17. Defendant has caused marketing materials and advertisements of the Lung Institute's services to be disseminated to consumers in Florida, and throughout the United States.

18. The cost of the procedures ranged from $5,000 to $12,500. Defendant additionally markets "supportive therapies," which are represented to be necessary for the continuing efficacy of the underlying and unproven service. These supportive therapies, such as "Growth Factor" and "Stemtrition," were and are marketed by Defendant to Plaintiff and the putative class members at costs up to and in excess of $500.00 per month.

19. Defendant also markets additional "stem cell" procedures to existing patients which are represented as increasing or continuing the efficacy of its sham treatments.

20. Each patient was and is responsible for paying the full cost of any procedure or treatment, as the Lung Institute did not accept health insurance, Medicare, or Medicaid. Moreover, health insurance, Medicare, and Medicaid refuse to provide coverage for these sham services.

21. Defendant urged and assisted prospective patients who could not afford the cost of Defendant's procedures to raise the funds through bake sales, Kickstarter campaigns, cash-out home refinancing and other fund-raising activities.

22. From 2013 to present, the Lung Institute has generated millions of dollars from persons in Florida who have become patients and undergone its advertised procedures. Regenerative Medicine Solutions, LLC, ("RMS"), through the Lung Institute, is currently making approximately $2,000,000 per month.

23. By and through Defendant's marketing materials and expressions made by representatives of the Lung Institute, the Defendant has made numerous express and implied deceptive and false representations, including, but not limited to, the following:

> a) Defendant's "stem cell" and other "supportive therapies," such as "Growth Factor" and "Stemtrition" are effective treatment for COPD, Emphysema, Chronic Bronchitis, Interstitial Lung Disease, Pulmonary Fibrosis, Bronchiectasis, and Pneumoconiosis.
>
> b) Defendant's "stem cell" and other "supportive therapies" will promote and/or cause organ or tissue regeneration or regrowth, specifically of the lungs, thereby treating, slowing, and/or curing patient's underlying pulmonary condition;

24. On or about April 2014, Plaintiff, Ms. Tammy Rivero (Ms. Rivero), presented to the Lung institute's Tampa, Florida office location.

25. On or about April 2014, Ms. Rivero complained of breathing problems and has a previous diagnosis of lung disease.

26. On or about April 2014, Ms. Rivero was evaluated by staff members of the Lung Institute, who concluded that she was a candidate for Defendant's stem cell therapy. Defendant made false and deceptive representations to Ms. Rivero regarding the efficacy of Defendant's procedures.

27. Ms. Rivero paid $7,500 to the Lung Institute to undergo the "venous" procedure. Plaintiff was encouraged to, and did, take out a home equity loan to pay for the procedure.

28. Defendant further represented to Ms. Rivero that she would be off supplemental oxygen therapy following the procedure.

29. Defendant additionally represented to Ms. Rivero that she would require additional "supplemental therapy" injections, at additional cost.

30. Subsequent to Defendant's procedure, Ms. Rivero did not and has not had any improvement in her symptoms or condition.

31. On or about January 18, 2016, Plaintiff, Mr. Howard Bennett (Mr. Bennett), presented to the Lung institute's Tampa, Florida office location.

32. Mr. Bennett paid the $6,500 to the Lung Institute to undergo the "venous" procedure. Mr. Bennett paid for the remaining $6000 balance with his credit card on the day of the procedure after previously paying a $500 deposit.

33. Defendant represented to Mr. Bennett that he would have a "reduced need for supplemental oxygen," "increased pulmonary function," "reduced need for additional medications," and that the procedure would "repair damaged lung tissue," and "arrest the progression of the disease."

34. Subsequent to Defendant's procedure, Mr. Bennett did not and has not had any improvement in his symptoms or condition.

## IV.
## ALTER EGO, INSTRUMENTALITY, AND DE FACTO DEFENDANT ALLEGATIONS

35. RMS now has a confederation of nationwide stem cell clinics with satellite locations consisting of LUNG INSTITUTE, LLC, LUNG INSTITUTE SCOTTSDALE, LLC; LUNG INSTITUTE DALLAS, PLLC; LUNG INSTITUTE NASHVILLE, PLLC; and LUNG INSITUTE PITTSBURGH, PLLC (collectively "Lung Institute Facilities"). Lung Institute, LLC, was a mere

instrumentality and alter ego of its parent REGENERATIVE MEDICINE SOLUTIONS, LLC, ("RMS"), the executives, managers, and shareholders of RMS in conjunction with RMS dominated and controlled Lung Institute, LLC, and all other Lung Institute Facilities.

36. RMS, along with the shareholders of RMS, fabricated multiple Lung Institute entities as described above to create a firewall and degree of separation between RMS and the stem cell treatments performed by the Lung Institute Facilities to avoid liability between RMS and the Lung Institute Facilities. RMS operated the multiple Lung Institute Facilities as the medical division of a parent marketing corporation.

37. Jimmy St. Louis, III, along with other RMS shareholders, executives, managers, employees, and agents of RMS, directed and controlled the employees, agents and contractors of all Lung Institute Facilities. RMS required the proceeds generated by the multiple Lung Institute Facilities to be paid to RMS. RMS treated and considered revenue by the Lung Institute Facilities as revenue generated by RMS.

38. The Lung Institute Facilities were required to adhere to all management, policy, and organizational decisions as dictated to them through RMS, its shareholders, executives, managers, and employees.

39. RMS was part of the leadership team that made decisions regarding: treatments, products, services, marketing strategy, compensation plans, incentives, contests, patient treatment, patient care and other matters. In addition, RMS shareholders, executives, managers, and employees were directly and actively involved in decisions to develop, market, and administer so-called "stem cell therapies".

40. RMS dominated and controlled all Lung Institute Facilities to such an extent that the companies' existence were in fact non-existent and the RMS shareholders along with RMS as a whole were in fact alter egos of the multiple Lung Institute Facilities.

41.     The corporate form was used for an improper purpose, to circumvent liability; and the improper use of the corporate form caused injury to the Plaintiff and Putative Class Members.

42.     Additionally, RMS has officiously inserted itself into the litigation of this case through the domination and control as described above. Parties may become de facto party defendants if they have control of the defense in furtherance of their own interest and enjoy all the rights of actual parties.[1]

43.     RMS is a de facto party as it controls the litigation brought against Lung Institute, LLC. RMS is paying for Lung Institute, LLC's defense and RMS has designated two corporate representatives, both of whom are not employees or contractors of the defendant. One of Defendant's representatives is an employee and executive of RMS and not an employee of the any Lung Institute facility, LLC. The other designated corporate representative is a contractor for Lung Institute Nashville, PLLC. RMS enjoys all of the rights of the actual defendant in this case, Lung Institute, LLC.

## V.
## CLASS REPRESENTATION ALLEGATIONS

44.     Pursuant to Florida Rule of Civil Procedure 1.220(b)(1)(B) and 1.220(b)(3), Plaintiffs TAMMY RIVERO AND HOWARD BENNETT brings this suit on behalf of all persons who have received Defendant's stem-cell therapy as marketed by Defendant and RMS from its Tampa, Florida principal place of business for the four years prior to the filing of the initial class action complaint.

45.     This Class shall consist of: All persons who underwent Defendant's venous, adipose and/or bone marrow "stem cell" therapy, and/or supplemental therapies, for the four years prior to the filing of the initial complaint at the Lung Institute facility located in Tampa, Florida and owned in whole or in part by RMS.

---

[1] *RHPC, Inc. v. Gardner*, 533 So. 2d 312, 314 (Fla. 2d DCA 1988) (*citing* Cartwright v. Atlas Chemical Industries, Inc., 623 P.2d 606 (Okla.1981)).

8

46. Plaintiffs allege on information and belief that the number of Class members is so numerous that joinder of all putative class members is impractical. Defendant has been engaged in the aggressive marketing of its "stem cell" therapy for a number of years, emanating from Defendant's alter ego RMS, and Defendant's profit from the aggressive marketing of their unproven therapy is believed to generate approximately $2,000,000.00 each month combined from all Lung Institute Facilities. RMS has circulated marketing materials claiming to have treated at least 3,000 patients since its inception. Based on these facts, Plaintiff believes that Defendant has induced thousands of persons into receiving Defendant's unproven therapy during the course of Defendant's operation.

47. The number and identity of this Class is easily ascertained from the records of Defendant and its alter ego RMS upon the commencement of discovery in this matter.

48. These claims raise questions of law and fact that are common to each of the Putative Class Members. Specifically, the central issues raised by this action are the Defendant's knowing, reckless or negligent, and misleading claims as to the efficacy of their "stem cell" treatments, including: venous, adipose and bone marrow procedures, and supplemental therapies. Defendant, through its alter ego RMS, utilizes a standardized marketing model to convey that its procedures will "repair, regenerate, or regrow" lung tissue to the Putative Class Members, including printed materials, standardized webinar and seminar presentations, and established talking-points.

49. The Class Representatives' claims are typical of the claim(s) of each member of the Class. The Class Representatives are Florida residents who will fairly and adequately protect and represent the interest of each member of the Class, each is fully cognizant of his or her responsibilities as Class Representatives and has retained experienced counsel fully capable of, and intent upon, the vigorous prosecution of this action.

50. Further, the common questions of law and fact, as alleged more fully below, predominate over any question of law or fact affecting only individual members of the Class and the

prosecution of separate claims by individual Class members would create a risk of multiple and potentially inconsistent judgments and/or verdicts. Class treatment is, therefore, clearly superior to other available methods and the only fair and efficient means by which this controversy may be adjudicated.

## COUNT I:
## DECEPTIVE AND UNFAIR TRADE PRACTICES

51.  Plaintiffs re-allege the allegations set forth in paragraphs (1) through (50) above, as if set forth herein.

52.  Florida's Deceptive and Unfair Trade Practices Act, Chapter 501 of the Florida Statutes, is to be liberally construed to protect the consuming public from those who engage in unfair methods of competition, as well as unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

53.  Plaintiff and Putative Class Members are consumers within the meaning of Fla. Stat. § 501.203(7) and have not been involved in any business giving rise to the unfair or deceptive transaction.

54.  Defendant engages in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

55.  While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's ("FTC") interpretations of these terms. Under the federal statute, an unfair or deceptive practice is that which "'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"[2]

56.  Defendant Lung Institute through its alter ego RMS, targeted the elderly through advertisements to the general public that Defendant's procedures were effective treatment for lung

---

[2] *Samuels v. King Motor Co. of Ft. Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001) (citing *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976).

10

diseases, of whom the Plaintiffs and putative class members are members. At the time these claims were made, Defendant had knowledge that no scientifically credible evidence supported Defendant's statements that lung tissue could be "repaired, replaced, or regenerated" through its procedures. Defendant failed to inform Plaintiffs and putative class members that no credible evidence existed to support the effectiveness of the procedures they aggressively marketed.

57. Defendant sold, marketed, and administered stem cell therapy procedures that had no basis in medicine and had no possibility of effectively treating Plaintiff and putative class members' lung diseases.

58. Defendant through its alter ego RMS created a scheme and mechanism of using doctors, commissioned sales people, and existing or former patients to recruit and deceive new patients into undergoing procedures. Once ensnared in Defendant's web, potential patients were encouraged to ask Defendant's doctors and cherry-picked patients for favorable testimonials. Unbeknownst to potential patients, other than the victims of Defendant's conduct, all participants in the Defendant's scheme were financially motivated to see new patients sign up for and undergo treatments.

59. Commissioned sales people known as "Patient Coordinators" are directly paid commissions based on the amount charged for each procedure sold. Existing and former patients are used as shills and rewarded with free and discounted procedures. Defendant's doctors are encouraged to assuage potential patient questions about Defendant's lack of scientific rigor by using deceptive marketing language approved by the marketing department.

60. Defendant has willfully engaged in the acts and practices alleged herein when Defendant knew or should have known that said acts and practices were unfair, deceptive, or prohibited by rule.

61. Through the Defendant's deceptive advertising related to said procedures as alleged herein, Defendant has committed acts and practices in trade or commerce which shock the

11

conscience, offend public policy, and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; acts and practices which are material and are likely to mislead consumers acting reasonably under the circumstances.

62. Deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. The practice employed by Defendant was likely to deceive a consumer acting reasonably in the same circumstances.

63. In engaging in the above conduct, defendant committed an unfair and deceptive trade practice and as a direct and proximate result of Defendant's deceptive trade practices, Plaintiffs and putative class members were deceived into believing that the Lung Institute's procedures were medically sound and effective, causing significant economic damage to Plaintiffs and putative class members.

64. Pursuant to Fla. Stat. §§ 501.211(2) and 501.2105, Plaintiffs and putative class members are entitled to recover from Defendant the reasonable amount of attorney's fees Plaintiffs and putative class members have incurred in representing their interests in this matter.

WHEREFORE, Plaintiffs demand that this Court enter judgment against Defendant LUNG INSTITUTE, LLC and the de facto defendant, its alter ego RMS, in an amount equal to the actual damages of Plaintiffs and Putative Class Members injured by reason of the violations alleged above, award reasonable attorney's fees and costs, and any other relief this Court deems proper.

## COUNT II.
## CIVIL REMEDIES FOR CRIMINAL PRACTICES, FLORIDA STATUTE 772.104(1)

65. Plaintiffs re-allege the allegations set forth in paragraphs (1) through (50) above, as if set forth herein.

66. Defendant and its employees and/or agents conspired with Regenerative Medicine Solutions LLC, endeavored, and with criminal intent to receive proceeds directly from the pattern of

criminal activity described in predicate acts throughout this Complaint. Specifically, Defendant, its alter ego RMS, violated Florida Statute 825.103 through the exploitation of an elderly person or disabled adult. Defendant and its alter ego RMS stood in a position of trust and confidence with an elderly or disabled person, as alleged under Count III below, and knowingly obtaining or using, or endeavoring to obtain or use, an elderly person's or disabled adult's funds, assets, or property with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult.

67. As described herein, the Lung Institute's very existence is premised on sham science and deception. In the case of the venous procedure, the Lung Institute knows none of its scientific literature supports any claim that the procedure is effective for treating any disease. The procedure bears no resemblance to any procedure cited by its scientific literature. For all procedures, the Defendant knows its procedures do not work as claimed, a.k.a. the "anecdotal" evidence the Defendant touts.[3] It bears repeating that there is no medical literature and no human studies that support Defendant's procedures.[4] Defendant continues to hyper-aggressively market these techniques for pecuniary gain alone.

68. Lung Institute, LLC in combination with its alter ego Regenerative Medicine Solutions, LLC, ("RMS"), and co-conspirators all Lung Institute Facilities and the employees, agents, or contractors of said facilities including: Burton Feinerman, M.D., in his capacity as former medical director of Lung Institute, LLC; Jack Coleman, M.D. in his capacity as medical director of

---

[3] The venous and bone marrow treatments are the only two procedures the Lung Institute currently offers, as it discontinued its "adipose" procedure when an unaffiliated Florida clinic that offered it was subjected to a government shutdown.

[4] The only published study Defendant even holds out in support of its procedure was performed on rodents with Mesenchymal Stem Cells, and there is no evidence the stem cell trapped in the lung of the rodent regenerated any tissue. The doctor who performed the study has since expressly disclaimed any use of his study to support stem cell "therapies" such as those the Defendant offers.

13

LUNG INSTITUTE NASHVILLE, PLLC; Jimmy St. Louis III in his capacity as CEO of RMS and principal manager of Lung Institute, LLC; Michael Perry, M.D. in his capacity as owner of LUNG INSITUTE PITTSBURGH, PLLC, and principal manager of LUNG INSTITUTE SCOTTSDALE, LLC; Mark Flood, D.O. in his capacity as managing member of LUNG INSTITUTE DALLAS, PLLC; James St. Louis Jr. in his former capacity as Chief Medical Officer of RMS and agent of Lung Institute, LLC; and Ann Miller in her capacity as employee of RMS, devised the scheme, and committed the acts alleged herein in the establishment and operation of its enterprise. It enriched and continues to enrich itself with the cash contributions of elderly, suffering victims to the tune of millions monthly. The Defendant was established to provide the procedures and follow-up "treatment" described in paragraphs 1-34, and they constitute Defendant's entire operation.

69. Defendant's existence itself is an open-ended, ongoing pattern of illegal activity. Further, the very nature of Defendant's business is deceptive, and was created to mislead elderly consumers, a group which encompasses Plaintiffs.

70. These acts committed by defendant have a clear relationship to one another, as they are all based on the same scheme and mechanism of misleading elderly and disabled consumers as to the basis and efficacy of Defendant's procedures.

WHEREFORE, Plaintiff demands that this Court enter judgment against Defendant LUNG INSTITUTE, LLC, and the de facto defendant, its alter ego RMS, in an amount equal to treble the actual damages of Plaintiff and Putative Class Members injured by reason of the violations alleged above, award Plaintiffs reasonable attorney's fees and costs, and any other relief this Court deems proper.

## COUNT III.
## BREACH OF FIDUCIARY DUTY

71. Plaintiff re-alleges the allegations set forth in paragraphs (1) through (50) above, as if set forth herein.

72.     A fiduciary relationship exists where confidence is reposed on one side and there is resulting superiority and influence on the other. The relations and duties involved need not be legal, but may be moral, social, domestic, and merely personal.[5]

73.     As an entity posing as a medical facility treating patients, Defendant owed and owes a fiduciary duty to its patients. This duty extends beyond non-concealment, but also requires candor and communication of unbiased factual information.

74.     By its failure to disclose the worthlessness of its stem cell "treatments" and the consequent worthlessness of any "supplemental" treatments, Defendant breached that duty.

75.     Defendant failed to disclose to patients the existence of any scientific evidence that did not support the Defendant's claims even though Defendant knew a majority of the scientific literature available on the subject did not support the Defendant's claims. Defendant selected the only few favorable scientific studies that existed which it could skew to support its claims and only disclosed that seemingly favorable information to patients in a deceptive and misleading manner.[6]

76.     Defendant knew or should have known that the overwhelming weight of scientific evidence did not support the claim that Defendant's procedures "repaired, regenerated, replaced, or slowed the progression" of any diseases claimed as treated by Defendant's procedures. Defendant never disclosed and actively deceived patients through its failure to state that no human studies showed its "stem cell" procedures were effective in treating any disease claimed treated by Defendant.

77.     Defendant failed to inform its patients about the differences in type, or kind, of stem cells that would be used in its procedures. Defendant actively misled patients into believing that the treatments it sold were of the same kind and nature as the procedures used in whatever scientific studies it based its sham treatments, Defendant failed disclose how the type, or kind, of stem cells

---

[5] *Jacobs v. Vaillancourt*, 634 So. 2d 667, 670 (Fla. 2d DCA 1994).
[6] Defendant's claims about procedure efficacy were based on a single study showing a reduction of inflammation in the lungs of rodents and anecdotal evidenced based on internal surveys.

15

related to the purported science Defendant claimed supported its procedures. Defendant failed to fully inform patients and disclose unbiased information regarding its procedures.

78. Defendant concealed the commission and payment structure used to incentivize its "patient coordinators." Patients had no knowledge that Patient Coordinators were commissioned sales people, directly financially incentivized to ensure patients would undergo Defendant's procedures.

79. Defendant referred new potential patients to Lung Institute patients that previously underwent the Lung Institute stem cell treatments to persuade new patients to undergo the marketed stem cell treatments. Throughout its sales process Defendant never disclosed that existing patients were incentivized through discounts and free procedures to provide testimonials.

80. Due to that breach, Plaintiffs have and continue to expend thousands of dollars on Defendant's therapies.

WHEREFORE, Plaintiff demands damages against Defendant LUNG INSTITUTE, LLC, and the de facto defendant, its alter ego RMS for breach of fiduciary duty and such other relief this Court deems just and proper.

## COUNT IV.
## CIVIL CONSPIRACY

81. Plaintiff re-alleges the allegations set forth in paragraphs (1) through (50) above, as if set forth herein.

82. Defendant LUNG INSTITUTE, LLC, Regenerative Medicine Solutions, LLC, ("RMS"), and co-conspirators all Lung Institute Facilities and the employees, agents, or contractors of said facilities including: Burton Feinerman, M.D., in his capacity as former medical director of Lung Institute, LLC; Jack Coleman, M.D. in his capacity as medical director of LUNG INSTITUTE NASHVILLE, PLLC; Jimmy St. Louis III in his capacity as CEO of RMS and principal manager of Lung Institute, LLC; Michael Perry, M.D. in his capacity as owner of LUNG INSITUTE

PITTSBURGH, PLLC, and principal manager of LUNG INSTITUTE SCOTTSDALE, LLC; Mark Flood, D.O. in his capacity as managing member of LUNG INSTITUTE DALLAS, PLLC; James St. Louis Jr. in his former capacity as Chief Medical Officer of Lung Institute, LLC; and Ann Miller in her capacity as employee of RMS, are parties to a civil conspiracy.

83. Defendant conspired to do a lawful act by unlawful means with Co-conspirators by creating a scheme and mechanism to sell its sham treatments with the guise that the treatments were supported by new cutting-edge science. The scheme and mechanism consisted of having RMS find potential patients by targeting the sick and elderly through webinars, google advertisements, email campaigns and other marketing efforts.

84. RMS used all Lung Institute Facilities as a de facto medical arm solely created to sell potential patients its sham treatments. RMS generated leads through its targeted marketing and culled its leads for value by placing them into categories. Potential patients with the ability to pay were considered the highest value. RMS employed Patient Coordinators, which were trained to hyper-aggressively target and sell treatments to these "high value" sick and elderly people. The sick and elderly in this scheme were unwitting victims being deceived into believing the defendant was a medical institute providing treatments supported by sound science.

85. As mentioned throughout this Complaint, there is no science to support Defendant's claims that its stem cell procedures are effective to treat any of the claimed diseases.

86. The doctors employed at Defendant's clinics were called Medical Directors, however, these directors were trained, coached, and monitored by the sales and marketing employees of RMS, including, but not limited to, Jimmy St. Louis III and Ann Miller. The Medical Directors, led by Jack Coleman, M.D, do not typically perform procedures, but instead are used to assuage potential patient's fears about the lack of scientific rigor in Defendant's treatments. Former Chief Medical Officer James St. Louis, D.O., and the other doctors employed by Defendant both past and present

were/are simply used as marketing tools by RMS, brought in to help close sales and give Defendant a patina of scientific backing.

87. Jimmy St. Louis III is both the CEO of RMS and the principal manager of Lung Institute, LLC. Jimmy St. Louis III is the puppet master pulling the strings behind Defendant and Co-conspirators. Jimmy St. Louis III created RMS and contemporaneously purchased the entity that would become the Lung Institute, LLC from with Burton Feinerman, M.D. Jimmy St. Louis III in combination with Burton Feinerman and other subsequent Medical Directors created the sham treatments sold by Defendant through RMS.

88. Jimmy St. Louis III operates and oversees all the Lung Institute Facilities as CEO of RMS. RMS is an umbrella company that holds itself out as having the same locations as the Lung Institute, with the addition of Peru. RMS and Burton Feinerman, M.D. arranged for "stem cell" treatments that are specifically not allowed in the US to take place abroad, and many of these treatments shock the conscience. As part of Defendants' collective "movement", RMS facilitates "stem cell" brain surgery on children.

89. The Defendant and Co-conspirators have subsequently separated themselves from association with Burton Feinerman, M.D. in order to distance the remaining Co-conspirators from the unambiguous quackery emanating from Burton Feinerman regarding the soundness of the procedures he created. The Defendant still uses the procedures created by Burton Feinerman to treat patients.

90. Dr. Michael Perry, who lives in Tampa, was paid to keep his license on the wall at the Lung Institute's facilities, including in Arizona, to provide Defendant Lung Institute an air of legitimacy. Dr. Mark Flood had the same type of agreement with RMS for the Lung Institute Dallas facility. Upon information and belief, Dr. Flood has disavowed having any knowledge of the operation of the Lung Institute Dallas facility even though he is listed as a the Principal manager of the entity.

91. Defendant owed a duty to plaintiffs to protect the plaintiffs from deception and sham treatments as described in this Complaint.

92. Defendant committed an overt act in furtherance of the conspiracy, by selling sham treatments, including the acts described in paragraphs under Count III above & Count IV herein.

93. Defendant's conspiracy and its respective overt acts caused Plaintiffs to suffer damages.

WHEREFORE, Plaintiff demands damages against Defendant LUNG INSTITUTE, LLC, and the de facto defendant, its alter ego RMS for civil Conspiracy and such other relief this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

DATED this 15th day of December 2017.

RESPECTFULLY SUBMITTED:

\_\_\_\_/s/ Ben Vinson_____
BEN A. VINSON, JR.
Florida Bar No. 95227
ben@vinsonlawoffice.com

VINSON LAW PL
505 E. Jackson Street, Ste. 305
Tampa, FL 33602
Phone: (813) 839-5708
Fax:    (813) 831-5043
**Attorney for Plaintiffs**